Case number 3090967, People of the State of Illinois, Appalachia, by Mr. Thomas D. Aredo v. DeMarion Porter, Appellant, by Mr. Chuck Bratz. Counsel, you may proceed. Thank you. Please, the Court, Honored Justices, Counsel for the People. The comments that I will make this morning will primarily have to do with our arguments that the trial court erred in finding that the evidence in this case, though largely circumstantial, was sufficient to establish the defendant's guilt beyond a reasonable doubt. It is my position that the record does not reveal evidence that would reasonably support a finding of guilt. I respectfully contend to you that a careful review of the evidence contained in the record, coupled with the newly discovered evidence in the term of admissions by the child's mother and the ineffectiveness of the trial counsel have created a scenario that clearly leads to the conclusion that the defendant appellate is entitled to some relief from this court. Before I begin my discussion of the evidence in the record, I would state to this court that I have reviewed the authority submitted by the State, and in particular, the Pintos case, cited in their motion to add authority that I believe was filed with the clerk just over a week ago, and I do concede that the proper standard in a criminal trial is the reasonable doubt test and not the reasonable hypothesis of innocence standard that we had earlier advanced. You're agreeing Collins is the... I am, Judge, and as an officer of the court, I have to concede that one. I was tendered the authority. But I would stress that I do not find, nor respectfully should this court find, that this clarification of the standard in any way takes away from the merits of the defendant appellant's argument as a review of the evidence in the record of this case will clearly show. This is a case where I was not trial counsel. We were hired after a verdict of guilty was rendered, a case where, regrettably, an 18-year-old child lost his life. My client, Dameron Porter, was convicted at the conclusion of a bench trial before the Honorable Judge Richard Shainstead in Will County for the offense of first-degree murder. The trial judge, in rendering his verdict, set forth that there were two issues. The first was, did the defendant cause the injuries that killed the minor child? And the second was whether or not the defendant appellant had the requisite mental state, either intent or knowledge, so that he could be found guilty, appropriately, of first-degree murder. Now, there was no direct evidence, no admissions by my client as to any specific act that caused the death of the child. There was no witness testimony that established that he had done something that caused the death. So what became very important, of course, was the medical testimony that is contained in the record. Dr. Stolsky, a pediatric specialist, testified, and he estimated the time of death to be at noon on October 31st of 2005, plus or minus 30 minutes. So we have a window according to the record that states evidence of a time period between 1130 and 1230. The doctor also testified to certain bruising on the neck, chin, upper ear, left lower eyelid, and abdomen of the minor child. And he indicated he observed some superficial skin hemorrhages that looked like a rash, could be mistaken for a rash. The medical term, I may not pronounce this correctly, was TKE. And he indicated that this could be caused by incorrectly administered CPR. The other medical testimony in the record that the court has before it is that of Dr. Brian Mitchell, the pathologist who performed the autopsy the day after the death of the child on November 1st of 2005. He testified to bruising above the eyebrow, on the cheek, on the jawline, right side of the neck, right shoulder, center of the abdomen, upper abdomen, and left ear. There were also scrapes on the left side of the face, inside the right knee. He also talked about the number of these small hemorrhages, the petechiae on the cheeks and eyelids, and said that all the bruising was of similar coloration, and his opinion was it was all recent, within 24 hours. He indicated that the petechiae was indication of strangulation. He also indicated that internally, that there was blood in the abdomen, that he opined came from at least two blows, and that there were healing rib fractures that were 6 to 12 weeks old. His final conclusion was that the child died of blunt force trauma to the abdomen, and that the injury was consistent with the child then becoming sleepy, that crying could be expected from the pain in the abdomen, but that the child would become unresponsive over a period of time. He further opined that the injuries could have been caused by an adult female, and it was possible for the child to have sustained the damage that caused his death, and then to have been handed off to another adult without the second adult noticing that anything had been done to the child. Now, this is a fact-driven case, so keeping in mind the medical evidence, we know also that the child's mother and the child, the child's mother being Jamie Jackson, had recently moved into the home where the defendant appellate and his mother and his sister resided. Through the testimony of the child's mother, the testimony of the defendant appellate, the testimony of the defendant appellate's mother, Geraldine Porter, there are certain facts that are clearly borne out in the record. The first one is that no one ever indicated that the defendant appellate showed any evidence of anger, a bad mood, irritation, or frustration of any sort on this day. There was also, secondly, no one ever indicated that the defendant appellate had any history of any abusive behavior toward the minor child. In fact, the mother of the child described in her words were, quote, real good, end of quote, with the child. Thirdly, there was no indication by anyone in the record that the defendant appellate had any motive to injure the child. The fourth point was that at all times when the defendant appellate was in the presence of the minor child on that day, other adults were always in close proximity. Well, the child, it was just the defendant and the child together in the shower, correct? That's correct, and I will address that, but I can put that the defendant and the child were in the shower. The context was he had gotten up, had gotten into the shower. The door to the bathroom was open. Everyone agreed on that. The child was brought to him by the child's mother, and the time frame where he is in the shower, the child is in the shower with the defendant appellate is between 4 to 10 minutes. During this period of time, it's also unrebutted in the record that the child's mother came and went out of the bathroom more than once, and that there were no screams, loud noises, inappropriate things that occurred or were heard in any way, shape, or form. Also, during this period of time, the defendant appellate received a phone call that all took place in this 4 to 10 minute period. Now, when the child, Jordan, first got into the shower, there were no signs of any bruising or any problem with the child, right, when he first got in the shower with the defendant? That is what everyone has said, but my argument in asking this court to consider what the record shows is that that is entirely consistent with the mother of the child having been the perpetrator of the offense, because what we have is a situation where my client gets up, gets into the shower. The mother of the child is back in the back room alone with the child. The child is described as screaming. I believe the reason for that screaming was the child was being heard at that time. He subsequently comes, the child is brought to my client, and certainly in that short period of time, there would be no evidence of bruising that would have appeared yet, so it would not be unusual that everyone would describe that there was no markings. One of the points that I think is extremely critical to realize here is that at the point when this child was handed to my client, this was not a child that was in normal health. There are a couple of clear indicators of that. The first one is the rib fractures. We have rib fractures that were 6 to 12 weeks old. These are in no way tied to my client. However, there is indication in the record of some inappropriate behavior on behalf of the child's mother, and part of the argument that we've set forth more fully in the briefing in reference to the ineffective assistance of trial counsel was his failure to call additional witnesses that would have established a pattern of abuse by the child's mother that would have been extremely relevant in determining what happened to this child. There's no question that somebody in the home on that day did something to this child that caused his death. I mean, the cause of death is not about the ribs. It's about these other things. That's exactly right, and that's certainly a very appropriate point. However, in looking at who it was that was responsible for this, certainly one of the factors that a court can consider is if there is a sustained and proven history of abuse that has taken place. As to in this case when we're looking at the Collins standard, what about the comments the defendant made to the police afterwards, the explanations? How would that factor in under the Collins standard where he believed that the child might have choked on some shampoo? That was one statement. He went to the Joliet Police Department and was interviewed for several hours, made some inconsistent statements, gave a variety of explanations of how the child might have been injured. Isn't that correct? Yes, and certainly I could understand whether- At one point I think he said the child slipped and he caught the child around the neck with his hand. Yes. Well, and let me address that. Okay. Certainly in reference to the record in this case, I mean, my client didn't do himself any favors by the lengthy statement that he gave to the police, and there's certainly things, depending on how you view it, that could be viewed as troubling. However, when you view the whole statements as a whole, there are some things that are borne out. The first thing is at no time after nine hours of extensive and very heated at times perhaps examination by the police officers, by not one, not two, but three different detectives who basically tag-teamed him and switched off, over a period of time where it was unrebutted in the record he had received no sleep, was on some medication, at no time did he ever make any statements saying that he had ever choked the child, strangled the child, punched the child, anything of that nature. If you look at his statements fairly, what was happening is the Joliet police in investigating this case- Well, at one point, I mean, as far as- At one point he said he stepped on the child's stomach when the child slipped on the floor. Yes, and I will address that. They formulated a theory of the case that focused on the defendant appellate to the exclusion of everyone else. They then bring him in for these extensive interviews and they tell him, do you think your mother killed the child? And of course he didn't. They asked him if he thought the mother of the child did, and he didn't think she did because he had no knowledge of what she had done in the room in the back. So they then start telling him, well, the medical evidence is this. These things happened to the child. And what he starts to do is to discuss things where, hey, the child may have slipped, I may have caught, and going through different things that I may have inadvertently stepped on the child when the child slipped, but at no time he is consistent in the fact that he did not cause any damage to the child, that nothing he would have done would have caused the child's death. Because he's consistent in the fact that he did not choke the child, did not punch the child, did not do any of the actions that caused the child's death. But he did take responsibility. He did in this sense. He did in the sense that he was the one when he came home that went in and discovered basically the lifeless body of the child. He then attempted to perform CPR to revive the child, and I think a fair way to look at the statements that he made is that he took responsibility in the sense that he wished he could have done more in order to have helped the child. At no point did he ever take responsibility from the standpoint of, I performed an act which caused this child's death. Mr. Brutz, is it your position that either he did not commit the crime as charged at all, or if he did, it was not intentional? That is correct. It would be our position that under the record that you have, Madam Justice, that either he did not commit the crime at all, and in fact the mother of the child was the perpetrator of the offense, or that the evidence in the record is insufficient to establish either a knowing or intentional act on his part that the worst-case scenario would hem that it would have been more of a conscious disregard, a reckless act, if you will, that would lead to perhaps an involuntary manslaughter or something to that effect, although we strongly believe that the record is such that he should be acquitted. Mr. Brutz, I have a question, although I do understand we're limited on time, but I think in response to one of Justice Carter's questions that you indicated that there was no injury or sign of anything when Jordan was taken into the shower, but it's my understanding from the record that the mother testifies that there was some bruising already on his eyes, but that the splotches on his face were already there. That's correct, and that's a critical point that I didn't get to finish up on. The critical point of that is that that is what the pathologist said is the indicator that the child had been strangled. So if we have a situation where the indication of strangulation has occurred prior to the child being handed to him in the shower, it is therefore consistent with the mother of the child having strangled the child in the back room, handing them off to him, and then the fact that strangulation has already occurred. The doctor said the child would begin to become lethargic over a period of time, which is what happened, but my client would have no knowledge of that because it occurred outside of his presence. The child was crying and then stopped as he got into the shower and then was handed back. One thing that's critical is when he gets done with his 4 to 10 minutes in the shower, he calls for the mother of the child to come there to bring him a towel. Someone who has just committed such an act in a 4 to 10 minute time span is not going to call a witness into the bathroom so they could see what had just happened. Mr. Brutz, you said, just one more quick question, that one of the doctors had testified that the injuries were consistent with someone having administered CPR. Is there evidence that that happened? There is evidence that that happened. When my client discovered the child, he immediately called for his mother, who was in the home, who was a 13-year registered nurse. They took the child into the other room. They were attempting to perform CPR on it. There's testimony in the record that he perhaps performed some of the CPR maneuvers, not being as skilled as his mother was trying to help, and did so in a manner inappropriate for an 18-month-old child that weighed 34 pounds. And so that, it was established, could have caused some of the markings on the child, at least some of them. And this was a bench trial? It was. So there was no jury? That is correct. Thank you, counsel. Thank you. Counsel, you may proceed. May it please the Court, good morning, Your Honors, counsel and our guests. We have the Collins Standard, which counsel has now conceded is the appropriate standard even in circumstantial evidence cases. The Collins Standard relies upon the trier of fact to weigh the evidence, to determine conflicts and resolve conflicts in the evidence, and to make it a determination of guilt. That's what Judge Schoenstatt did in this case. He made findings of fact based upon the testimony, evidence presented, and the recordings of the defendant's statement. There are things that we know specifically from the evidence, that at the time that the mother of the child handed over the child to the defendant, she testifies he was in fine health except for a bruise on his eye and the little splotches. There was no direct testimony saying that the splotches, she testified, she believed that they were the effects of him drinking orange juice. Apparently he would react to that. There's no direct evidence saying that the splotches that she saw were exactly the same petechia that was seen on the child after death. But regardless... Did the medical examiner find orange juice? I don't think that there was any testimony regarding what the contents of the child's stomach was at that time, no. But when she testifies, she says, I thought it happened from drinking like juice, that he would break out when he would drink orange juice. But then, like you guys told me... Sure. So, I mean, there's some testimony that she was told it wasn't a rash from drinking juice, that it was because he had been strangled. That is what she said. Well, she said, well, then you guys told me this. Well, it's her belief versus what she's told. Again, that's a conflict, perhaps, in the evidence that is resolved by the trier effect. Not only that, even if she had... The cause of death in this case is not the strangulation. It is blunt force trauma to the abdomen. That caused... But if she... If there is strangulation present before the child is taken into the shower, are you suggesting maybe she strangled him but she didn't administer the blow to his stomach? Even if you accept that she strangled him, and I'm not conceding that in any way, my argument is that the trier court got to resolve all those conflicts of the evidence and did so and found the defendant guilty. Does Collins give us a basis for rejecting findings of that? Only if the evidence is so fanciful that no rational trier effect would find the defendant guilty. And in this instance, the testimony is that he was fine, handed over to the defendant. Now, the argument is, well, he was only in there for 4 to 10 minutes. Dr. Mitchell, the coroner, said, one minute is sufficient time to inflict this blow. He has no motive to do this. People cite in our brief that we don't have to show motive. Why would he do this? We don't know exactly. You can speculate. I just got in the shower. Now my girlfriend's bringing me this child to wash. This child is now becoming a very irritable and fussy, as he says. Snaps. Bam. Make the child shut up. There's testimony that there's this gurgling sound. Part of that that you last said wasn't part of the record, right? I'm sorry, what? You're just speculating. Yes, that is purely speculation. But the trier effect has to make reasonable inferences from the record in order to find, you know, he's considering what's the motive. I'm saying, well, we don't have to show motive. We don't have to show what his complete mental state is. Only that knowledge that hitting a child with that force would have caused great bodily harm or leading to death. In this instance, if the child is healthy, as the mother testifies to, and then the defendant takes complete control of this child, says, okay, bring me this towel. Then what does he do? He takes the child into his bedroom, puts the child in bed, covers him. When the mother goes to see him, he says, oh, no, no, don't worry about him. He's sleeping. That's evidence that he knows something is wrong with this child now and that he did it. Now he tries, now he leaves. The mother says, well, let me see, let me put a shirt on him. No, no, you don't have to do that. He's got a cover on him. The mother doesn't physically go near this child from the moment goes into the shower, other than give the towel, until the child ends up dead. Dr. Skolski testifies that the time of death is between 12, is around 12, plus or minus 30 minutes. That's the time of death, not the time of injury. Dr. Mitchell testifies that the evidence shows that the child bled out at least 10% of his bodily liquid, the blood, in his body cavity. And that likely or possibly occurred within one hour, likely several hours. He said it is unlikely that it would be within one day. So we still have the same time frame which the defendant could and we submit did cause these injuries. Also within that time frame is the time when the mother had the child and he was screaming. Well, interesting about the screaming testimony. Two people testified as screaming. His mother and, of course, the defendant himself. Credibility determinations are left to the trier of fact. In rebuttal- I'm just asking you about the window of time. Oh, sure. Okay. Except you're including that the child was screaming within that window. One of the detectives came back in rebuttal and testified that the mother never said anything about the child screaming when he interviewed her. So, again, it's a credibility determination that goes to the trier of fact. In this case, the judge. It was Ben's trial. Okay. The testimony regarding the CPR. Now, Dr. Mitchell indicated that it would be possible, but he also said it was usually would not produce enough pressure to cause those types of injuries. So, again, evidence to be resolved by the trier of fact. Okay. Statements regarding the interview with the defendant. Nine hours of statements. Those were not all at once. There were two interviews, at least, with the defendant. And the second one he initiated. After the first one, he asked, well, can I have your phone number to the detective? And then the next day he calls him up because he wanted to talk more. He wanted to talk more. And as the judge suggests, it was probably to try and find out what the police knew because he knew that he was in trouble for this. Why? Because he did it. So, since he has not addressed the other two issues, we'll stand on our brief on those issues, unless you have any specific questions. I don't. Okay. Thank you. Counsel. Counsel. Thank you. Mr. Jonathan, please report. Counsel for the people. There was a very insightful comment made in reference to the fact that there was no evidence of any sort in reference to drinking orange juice. There was evidence, particularly of the fact that this hemorrhaging existed at the time the child was passed off. The State would, and the reason why we believe that this is not a case where a rational trier of facts should have found the defendant guilty, is because other than some extrapolation of things from the defendant's statement of which there are no specific admissions, other than him saying, you know, he feels responsible, he couldn't have done more, that there's this extrapolation, this speculation that maybe he snapped. Highly unlikely, totally contrary to human nature, that someone is going to snap and then call a witness into the bathroom. What happened is the child is taken back into the room and at that point appears to go back to sleep, which is consistent with what Dr. Mitchell said would happen, that the child would become unresponsive over a period of time. It's interesting that the mother did not note anything unusual about her child who had just gotten up going back to sleep. And it is not the case that the mother had no contact with the child, because what the State forgot to mention in their comments was that they left shortly thereafter and the mother went back into the home for a period of some time to get her keys and would have been alone with the child back in the room where they stayed. So in addition to the period of time that existed before the shower, there was a second period of time where she was alone with the child, unlike the defendant who was never alone with the child other than this brief period of time in the shower and that only with people around, including the child's mother, coming in and out of the room. The nine hours of statement were over a course of a couple of days with no sleep. You know, one of the problems in this case is it all surrounds the Collins Standard. Wouldn't you agree with that? I do. And there are a lot of plausible explanations or arguments that can be made on the facts in this case. But under the Collins Standard, then there was the fact finder who makes those judgments. It is, Judge. And for us to reverse, we have to find that those findings are so improbable and unsatisfactory that it leaves a reasonable doubt. I mean, that's a tough standard for you to meet. It is a very tough standard. And one of the most compelling things that we have is the issue that was brought up by Justice O'Brien in reference to the patiki, the hemorrhage in the face, because that existed at the time when the child was handed to the defendant appellate in the shower. So it just defies all logic that the mother of the child would have strangled the child and then not been the one to administer the blow to the abdomen. And so under that scenario, with the clear scientific, the only evidence in the record as to when that existed, and then her giving the lame excuse that I think this happened from orange juice when there's no indication he had even drank any orange juice that particular day. And then, of course, she makes the comments, oh, but you guys told me. So it's a scenario where clearly the detectives in the case focused their investigation on the defendant, never properly looked at it, and under the evidence you have, scientific evidence that exists in the record, it's such that the damage to the child took place prior to the child being handed off to my client in the shower, and it was subsequent to that that everything happened that the child then became unresponsive, went back to sleep, everything happened that was consistent with what the pathologist said would happen with the child having been damaged already. And when you couple that with the fact that you have a history, some evidence of history of abuse, inappropriate behavior of the mother, you have the fact that you have rib fractures six weeks old that have nothing to do with the defendant, that obviously something was happening with this child. You have evidence in the record such that it is clear that I believe that even under the Collins standard, that my client is entitled to some relief and this court should grant that. In this record we have, there's no doubt the cause of, I mean, from the doctor's testimony here, the cause of death was the abdominal blunt force trauma. That coupled with strangulation. And your client made some incriminatory and inconsistent statements that we talked about before in the series of interviews. Yes. With regard to possibilities of trauma to the stomach. He did, but here's what he said. He talked about that I may have made some contact with the stomach with my foot. I may have done something in reference to when the child had swallowed a little water, made some contact with it. But the one thing he was very clear about, I never punched the child. I never choked the child. I did not do the actions that caused this child's death. He was very clear on that. And it's interesting in the record that one of the things that happens is the state asked the detective a question and said, didn't the defendant appellant say, I killed him, I killed him, I'm guilty, I'm responsible. And the detective answered affirmatively. The state then cites that in their brief, and in reality, that statement was never made. There is never a statement to that effect in reviewing the tapes, which I have done extensively. That statement in that format is never made. It's always the kind of sense where I'm responsible, I wish I could have done more, things of that nature, but never any admission to any actual acts, and certainly not a statement that was testified to and then picked up on by the state. Because obviously in preparing the brief, they did not actually review the tapes and look at the actual transcripts. Thank you very much. Mr. Brutz, I have a factual question. Yes, ma'am. It was not totally clear to me from the briefs whether we were talking about manual strangulation or whether there was some sort of strangulation that resulted from the amount of blood that was in the cavity. Was there manual strangulation? It was alleged. The only evidence there was was of manual strangulation because the doctor said that there was bruising that was consistent with fingers. All right. Any other questions? Thank you, Counselor. Thank you. The court will take this matter under advisement.